THOMAS M. BURTON (035856)
5820 Stoneridge Mall Road, Suite 100
Pleasanton, California 94588
(925) 484-3233
(925) 484-4412

Wesley D. Hutchins
SCALLEY  & READING
261 East 300 South, Suite 200
Salt Lake City, Utah 84111
(801) 531-7870
(801) 531-7968

Attorneys for Plaintiffs Goold

# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STANLEY GOOLD, III. and STANLEY GOOLD, JR.<br><br>    Plaintiffs,<br><br>   v.<br><br>TEEN HELP, a partnership; PARADISE COVE, a corporation; WORLDWIDE ASSOCIATION OF SPECIALTY PROGRAMS, a corporation; BRIGHTWAY HOSPITAL, a corporation; RESOURCE REALIZATIONS, a corporation ; R&B BILLING, a corporation; DIXIE CONTRACT SERVICES, a corporation; TEEN ESCORT SERVICES, a corporation; BRIAN VIAFANUA; NEWTON PRATT; KEN KAY; ROBERT B. LICHFIELD; KARR FARNSWORTH; BRENT M. FACER,<br><br>    Defendants<br>——————————————————/ | No.<br><br>**COMPLAINT FOR NEGLIGENCE; NEGLIGENT CHILD ABUSE; FALSE IMPRISONMENT;  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; BREACH OF FIDUCIARY DUTY; RICO; NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br><br><br><br>**JURY TRIAL DEMANDED** |

Complaint

1

Come now the plaintiffs, Stanley Goold, III, and Stanley Goold, Jr., and allege as follows:

## PARTIES

1. Plaintiff Stanley Goold, III (Stan) is the son of the plaintiff Stanley Goold, Jr. (Stanley). Stan was enrolled at Paradise Cove from 1997 to 1998 while he was a minor. At the time Stan was taken to Paradise Cove, Stanley Goold, Jr. had joint legal custody with Stan's mother, Jane Goold, of Stan with full rights of visitation. At the direction of Jane Goold, Defendants kidnapped Stan and took him to Paradise Cove against his will and without the consent of his father, Stanley Goold, Jr. Both plaintiffs are citizens of the State of California.

2. The Worldwide Association of Specialty Programs is a non-profit corporation organized under the laws of the State of Utah with its principal place of business in St. George, Utah, of which Karr Farnsworth is the Executive Director. It is an umbrella organization controlling and regulating all Teen Help programs. It is the alter ego of each and every other named entity defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others.

3. Teen Help is a non-profit corporation organized under the laws of the State of Utah with its principal place of business in St. George, Utah. It is the alter ego of each and every other named entity defendant, Robert B. Lichfield being its general partner, and answers to a centralized governing group of the named individual defendants. It purports to help desperate parents of at-risk teenagers put them in appropriate treatment centers, but, in practice, only refers

them to its own stable of youth camps.  It is the defendants' marketing arm to recruit adolescent inmates for Cross Creek Manor, Paradise Cove, Tranquility Bay, Morava Academy, and other off-shore cult camps run by some of the other defendants.

4. Paradise Cove is a corporation organized under the laws of the State of Utah with its principal place of business in Western Samoa.  It is the alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others.  It is one of many closed and secret cult centers owned and operated by the defendants where adolescents are impounded, tortured, berated, brainwashed, and otherwise abused by the defendants.

5. Brightway Hospital was at all times material a corporation organized and licensed under the laws of the State of Utah with its principal place of business in St. George, Utah.  It is the alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants.  It purported to be an adolescent treatment center which, by the use of psychological evaluations, supposedly screened Teen Help candidates for appropriate placement.  In reality, Brightway was a lock-down holding cell through which kidnapped adolescents were processed for passports before being transported to various cult centers owned and operated by the defendants.  Its operation was so incompetent that the State of Utah has revoked its hospital license.

6. Dixie Contract Services is a corporation organized under the laws of the State of Utah, with its principal place of business in St. George, Utah.  It is

the alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others. It hires and directs so-called escort services to kidnap adolescent candidates from their homes, often in the middle of the night, and take them by force to Brightway hospital for psychological screening and passport procurement before being transported abroad.

7. Teen Escort Services is a corporation organized under the laws of the State of Utah, with its principal place of business in St. George, Utah. It is the alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others. It hires and directs so-called escort services to kidnap adolescent candidates from their homes, often in the middle of the night, and take them by force to Brightway hospital for psychological screening and passport procurement before being transported abroad.

8. R & B Billing is a corporation organized under the laws of the State of Utah, with its principal place of business in St. George, Utah. It is the alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others. It bills and collects exorbitant fees charged by the various Teen Help cult centers by misrepresenting to insurance companies that the Teen Help programs are either therapeutic or educational depending on the coverage available.

9. Resource Realizations is a corporation organized under the laws of the State of Utah, with its principal place of business in St. George, Utah It is the

alter ego of each and every other named defendant, being under the control of and responsible to a centralized governing group of the named individual defendants, among others. It plans and conducts the behavior modification seminars for inductees and their parents, which modifies the values and impairs the psychological health of both groups.

10. Robert B. Lichfield is an owner, partner, shareholder, or otherwise directs the conduct and activities of each and every named corporate or partnership defendant. He is a citizen of the State of Utah.

11. Karr Farnsworth is an owner, partner, shareholder, or otherwise directs the conduct and activities of each and every named entity defendant. He was, at all times material, the director of Cross Creek Manor. He is a citizen of the State of Utah.

12. Brent M. Facer is an owner, partner, shareholder, or otherwise directs the conduct and activities of each and every named entity defendant. He is a citizen of the State of Utah.

13. Ken Kay was, at all time material, the director of Brightway Hospital in St. George, Utah. Stan told Mr. Kay, and every staff psychologist he saw at Brightway, that his father had joint legal custody, that he had been abducted without his father's knowledge or consent, and asked him to contact his father to obtain his consent to his being in the Paradise Cove program. Mr. Kay refused any contact or attempt at confirming the legality of Stan's presence in the program. He is a citizen of the State of Utah.

14. Brian Viafanua was, at all times material, the director of Paradise Cove. He is a citizen of the nation of Western Samoa.

Complaint                                    5

15. In all things herein alleged and at all times material, all defendants were acting as agents for, or joint venturers with, the other defendants.

## JURISDICTION

16. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1). The matter in controversy exceeds the sum of Fifty Thousand Dollars, exclusive of interest and costs.

## VENUE

17. Venue is appropriate in this Court pursuant to the provisions of 28 U.S.C. § 1391(a) and (c).

## FACTS

18. Stan's parents are divorced. His mother, Jane, had sole physical custody and joint legal custody of Stan with his father. Frustrated over her own frayed morality, Jane became hypercritical of and authoritarian over Stan. Stan never caused Jane any serious problem, but tried beer and marijuana briefly. She did not approve of his friends and felt that she was losing the absolute control of his life that she demanded.

19. She enlisted and conspired with the defendants to kidnap Stan from their home and induct him into a cult camp in Western Samoa, ironically called Paradise Cove. Knowing full well that this plan would violate the right of Stan's father to exercise joint custody of their son and would sever his right to visitation, Jane neither consulted with nor obtained permission from Stanley

Complaint                                   6

Goold, Jr. to take their son far from the United States by force for an indefinite period of time.

20. At 3:46 a.m. on November 30, 1996, three large men employed by Defendants surrounded and awakened Stan in his bedroom. They bodily and forcibly removed Stan against his will from his home in California to an awaiting car where they confined him during the long ride to Brightway Hospital in St. George, Utah.

21. Brightway purported to perform a psychological evaluation of Stan based upon unfavorable anecdotal information beforehand supplied to Brightway by Jane. While talking with two persons representing themselves as psychologists, Stan informed them that his father had custodial and visitation rights, and that Stan wanted to speak to him about what was happening. Stan also made the same request of Ken Kay, the hospital director. These defendants would not let Stan contact his father and kept secret their conspiracy with Jane to interfere with the legal rights of both father and son because they knew that to do so would jeopardize the extensive monies already pledged by Jane.

22. While posing as a hospital, Brightway's adolescent services, licensed by the Utah Alcoholism Foundation, was, in reality, merely a holding cell in which to keep Paradise Cove inductees while their passports were processed on an involuntary and expedited basis. When Stan's passport was obtained after one week, Defendants forcibly transported him against his will to Las Vegas Airport, then to Los Angeles International Airport and on to Honolulu Airport, and, from there out of the United States to the Island of Western Samoa, and by small plane to Apia, Samoa. Defendants' security guards were stationed at each

Complaint                                          7

airport to prevent Stan and the other inductees from escaping.

23. By a frequent and consistent pattern of false representations and suppressions of fact, Defendants promoted, by their Paradise Cove program, the benefits of reforming truant or academically deficient teenagers at their cult camp in Samoa. Once enrolled in Paradise Cove, Defendants employed Teen Help's secret psychotherapy of threats, intimidation, invasion of privacy, physical abuse, mental abuse, verbal abuse, and random punishment to break their captives' will and keep them confined. At the same time, Defendants cut off all meaningful communication between parent and child and lied to the parents that their children were enjoying the Samoan experience which should always be extended for maximum benefit. For parents able to visit Samoa, Paradise Cove put on a false front and concealed its demented treatment of their captive sons.

24. Defendants misrepresented to the parents of inductees that the Paradise Cove programs was safe, wholesome, and staffed with trained counselors and teachers to assist their children in gaining self-esteem and unleashing their true potential. The program was, to the contrary, abusive, dangerous, and degrading.   It was staffed by uneducated, uncredentialled, and sadistic local natives hired at substandard wages who, at worst, tormented the youth enrolled and who, at best, had no idea what they were doing. The more courageous a youth was in standing up to the injustices and degradation heaped upon him, the longer he would be forced to  stay at level one or two, until his will was broken and he became the minion the Paradise Cove program was designed to produce.

Complaint                                              8

25. In order to foster loyalty to the program and turn the paying parents into unwitting recruiters of other distraught parents, Defendants promised current parent participants a commission of one month's free enrollment, or cash after their child's period of enrollment, for every new recruit gained.  Parents were also required to attend two three-day seminars designed to blunt expected criticism from their children, and convert them into frenzied supporters of the program.  Thus, when reports of abuse inevitably surfaced, their sons' accounts were greeted by the smug recognition that such reports were exactly what Paradise Cove had told the parents to expect from their manipulative youth. The parents never even considered that the reports of abuse might be true.

26. Defendants skillfully inculcated, indoctrinated, and programmed the involved families into a Maslowian humanistic philosophy of values alteration. They used outmoded and discredited presumptions that all youth hated their parents and needed to release the pent- up rage of their suppressed childhood abuse.   Defendants also used Lifespring techniques to uncover and redesign the underlying false assumptions upon which their charges' lives were supposedly premised, such that the child thereafter became liberated to a new value system of ostensible original design, but actually inculcated by Defendants.  The giddiness of this personal remake produced in the parents involved an irrational veneration of the very defendants who had taken their money and abused their children.  Defendants concealed from the parents and their sons this strategy of keeping the boys in their camps and the cash flowing.

27. Stanley, not having been indoctrinated by the Teen Help cult, recognized that his son had been kidnapped into a money-making scam far from

governmental regulation and parental oversight. He asked Paradise Cove to send back his son. It refused. Paradise Cove then instigated and funded an effort by Jane to wrest from Stanley full legal custody so that Stan's confinement could not be challenged. At great expense and a year's effort, Stanley won full custody and rescued Stan from Paradise Cove.

28. Once at Paradise Cove, Defendants made Stan sleep on a small mat on the floor of a crowded room with only one fire exit, and barred windows. Surveillance cameras were everywhere and lights remained on at Le Tiera, his initial compound. He was forced to attend six Discovery seminars and one Focus seminar to break him down into the lingo and format of the remake program. The seminars were designed to break his spirit so that he would realize that there was no hope for him anywhere else but in working the program as required.

29. Only cold showers were available. Stan was forced to subsist on rice, bread, and milk with little variation from fish, fruits and vegetables. Stan, along with most of the inductees, developed large boils on his arms and legs from malnutrition, and rashes from ringworm. Although there were professed nurses on site, their primary duty was handing out antidepressants. Once maggots were found in the tuna casserole and over a dozen students got sick. Defendants concealed from Stan's parents that privation was their perversion of the Maslowian hierarchy model.

30. The Samoan staff were large, and physically beat the youth. Stan suffered physical abuse, which included punching, being kicked, thrown, pushed and choked, hog-tied, and put in an isolation box. Paradise Cove

Complaint                                    10

censored Stan's mail, making it impossible to communicate these conditions to his father.

31. Homosexual attacks by the staff were tolerated, but not masturbation by the inmates. After his return, Stan suffered from nightmares every other night involving fear and helplessness, and anxiety over having to return to Samoa. His whole time there was like one long anxiety attack.

32. The educational component was fraudulent. The Samoan proctors were uneducated and spoke only broken English. The course of study was the same for everyone, and involved reading a text and taking a test in various subjects, with no instruction given. Stan finished the American Literature one-year course in two days. The rest of the time was spent cleaning the beach and in aimless physical activity. Aside from beatings, punishment also consisted of being put in an isolation box for long periods of time with nothing to do.

## FIRST CAUSE OF ACTION

### (Negligence)

33. Defendants owed Plaintiffs a duty to screen Stan in order to protect him from induction into a boorish and brutal program whose rigors might foreseeably injure him. Defendants breached their duty by failing to screen Stan out of their program and, to the contrary, by admitting him into a program which they knew, or should have known, would be detrimental to him.

34. Defendants owed Plaintiffs a duty to consult some reputable psychiatrist to see whether or not he should even be in a sadistic program of this nature.

35. Defendants owed Plaintiffs a duty not to induct Stan into their program unless and until they had the informed consent of both parents having joint legal custody.

36. Defendants owed Plaintiffs a duty to employ, or at least engage, professionals qualified to address any specific needs which legitimately justified Stan's induction and retention into such a program.

37. Defendants breached their duty by inducting Stan into their demented program, by failing to engage quality professional help, and by punishing Stan as an criminal instead addressing any specific need justifying his presence at Paradise Cove.

38. Defendants' conduct proximately caused Stan personal injury and emotional distress from and after his 1997 induction to date.  Defendants' conduct foreseeably and proximately caused Stanley Goold grievous emotional distress over the welfare and safety of his son and cost him many thousands of dollars in legal fees required to get him back.

39. Defendants' conduct was malicious, wanton, and in reckless disregard of Stan's health, safety and welfare, by reason of which he is entitled to recover punitive damages against them.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated.


## SECOND CAUSE OF ACTION

### (Negligent Child Abuse)

40. Plaintiffs incorporate by this reference paragraphs 1 through 32 as if stated in full.

Complaint                                    12

41. Defendants, while having the care, custody and control of Stan as a surrogate mother, had a duty to promote his health, safety, and welfare. Instead, Defendants breached their duty to Stan by isolating him and keeping him prisoner in Western Samoa where:

a. they negligently removed him from the United States without his father's consent,

b. they negligently subjected him to conditions and circumstances likely to produce great bodily harm,

c. they negligently inflicted upon him unjustifiable physical pain and mental suffering.

d. They negligently caused him to suffer pain, thirst, fatigue, and confinement.

e. they negligently caused or permitted him to be injured, and

f. they negligently caused and permitted him to be placed in such a situation that his health was endangered and impaired.

42. Defendants' conduct proximately caused Plaintiffs personal injury and emotional distress.

43. Defendants' conduct was malicious, wanton and in reckless disregard of Stan's health, safety and welfare, by reason of which he is entitled to recover punitive damages.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated.

## THIRD CAUSE OF ACTION

### (False Imprisonment)

44. Plaintiffs incorporate by this reference paragraphs 1 through 32 as if stated in full.

45. Stan learned upon arrival at Paradise Cove that his father was unaware of its purpose and program. He sought at that time to communicate with his father and to leave the program, but Paradise Cove censored his mail, restrained him from any contact with the outside world, and refused to permit his return home.

46. Paradise Cove's imprisonment of Stan without benefit of judge or jury caused him serious and permanent emotional distress, and psychological injury.

47. Paradise Cove's conduct was malicious, wanton and in reckless disregard of Stan's health, safety and welfare, by reason of which he is entitled to recover punitive damages.

WHEREFORE, Stan prays for judgment against Defendants as hereafter stated.


## FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

48. Plaintiffs incorporate by this reference paragraphs 1 through 35 as if stated in full.

49. Paradise Cove's philosophy of tormenting and intimidating Stan, invading his privacy, depriving him of nutritious and wholesome food, proper

Complaint                                    14

sanitation, educational opportunities, exposing him to denigrating immoral and filthy conditions, subjecting him to imprisonment, attempting to break his will, inflicting unjust punishment, depriving him of legal rights, keeping him in isolation, depriving him of the care, comfort, support, and sustenance of his father, and other demented conduct, caused Stan personal injury and mental and emotional distress.

50. Defendants' conduct in depriving Stanley of his son's society, companionship, and communication caused Stanley manifold grief, anxiety and worry over his son's welfare.

51. Defendants' conduct was in reckless disregard of Plaintiffs' health, safety and welfare, by reason of which Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs pray for judgment as hereafter stated.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

52. Plaintiffs incorporate by this reference paragraphs 1 through 32 as if stated in full.

53. By seeking, and illegally obtaining physical custody of Stan from his mother, and thereafter, by placing him into a captive and abusive environment of their own making, Defendants undertook a fiduciary duty toward Stanley Goold, Jr. and toward Stanley Goold, III as to Stan's health, safety and welfare.

54. Paradise Cove, in the manner described above, breached its fiduciary duty as a parental surrogate, which proximately caused Stan to sustain pain,

Complaint                                    15

suffering, bodily injury and mental and emotion distress, and caused Stanley Goold, Jr. great mental and emotional anxiety over the welfare and safety of his son.

55. The conduct of Paradise Cove was malicious, wanton and in reckless disregard of Plaintiffs' trust and of Stan health, safety and welfare, by reason of which Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Paradise Cove as hereafter stated.

## SIXTH CAUSE OF ACTION

### (RICO)

56. Plaintiffs incorporate by this reference paragraphs 1 through 32 as if stated in full.

57. As part of a scheme and artifice to defraud, and as a means by which Defendants could obtain money from families having sons about whose associations, values, study habits, or good citizenship they were concerned, Paradise Cove falsely represented to Stan's mother that it was adept in behavioral modification for teenagers; that inductees would have one-on-one support and guidance by trained and caring counselors; and that the program was safe, wholesome, caring and beneficial. Defendants concealed that the program was cultist, coercive, and criminal.

58. Defendants further made these misrepresentations and indulged in these concealments not only to Jane, but to Stan, Stanley and the parents of numerous other young men inducted into Paradise Cove.

Complaint                                16

59. None of the above stated representations was true, but instead all of the above stated representations were false, and were made to the parents of the young men induced to enter the Paradise Cove program with the intent and for the purpose of causing the parents to pay to Paradise Cove large amounts of money per month per child enrolled, even though the cost for the services rendered by Paradise Cove was negligible and the services themselves were demented, dangerous, and detrimental.

60. The excessive amount charged by Paradise Cove for the privilege of abusing Stan and other young men was fraudulent in that it was both far in excess of the actual costs incurred by Paradise Cove for the abuse meted out, but was fraudulent as well in advancing the ruse that Paradise Cove was providing a therapeutic, social, and educational experience approximating in value the monthly amount charged, including normal operating and overhead expenses.

61. Paradise Cove always reported to Jane Goold and other parents over telephone lines that their sons were enjoying the program when in reality, Defendants knew that the respective parents' sons were being tormented and abused by Paradise Cove so as to become worse off than when they came into the program. Defendants made all of the above-referenced fraudulent and untrue statements knowing them to be untrue or knowing that they had no information to support the truth of their statements. This, they did for the purpose and toward the end that the parents of the enrolled and captive children would not withdraw their children from the program, but instead, would continue to pay the excessive fees charged by Paradise Cove for keeping their

Complaint                                    17

children in the program.

62. All of Paradise Cove's concealment, propounded falsities, and misrepresentations of true facts were made by telephone or by letters sent through the United States mails. All of Paradise Cove's remittances and payments obtained by its fraudulent representations were received through the United States mails across state lines.

63. The knowing and intentional failure of Paradise Cove and its principals, to disclose material facts and their deliberate misrepresentation of material facts in conjunction with the telephone conversations and letters, checks and other remittances sent through the United States mails described above constitute repeated violations of 18 USC §1342 relating to wire fraud and 18 USC §1341 relating to mail fraud, and further constitute acts of racketeering activity as that term is defined in 18 USC §1961(1)(b).

64. Defendants are capable of holding a legal or beneficial interest in property and are persons subject to the Racketeer Influenced and Corrupt Organizations Act pursuant to 18 USC §1961(3).

65. The individual defendants were associated in fact through their management and operation of Paradise Cove and its alter ego entities, which association in fact constituted an enterprise as the term *enterprise* is defined in 18 USC §1961(4).

66. During all relevant time, Paradise Cove was a corporation and therefore an enterprise as the term *enterprise* is defined in 18 USC §1961(4).

67. During all relevant time, the individual defendants constituted an enterprise as the term *enterprise* is defined in 18 USC §1961(4).

Complaint                                18

68. The wire frauds and mail frauds perpetrated by the defendants upon the plaintiffs constituted a pattern of racketeering activity consisting of more than two acts of racketeering activity, all of which occurred after the effective date of 18 USC §1961 *et seq.*

69. Defendants used income derived from the above-described pattern of racketeering in the operation of their enterprises, the activities of which affected interstate commerce, in violation of 18 USC §1962(b).

70. The individual defendants acquired and maintained control of the enterprise, the activities of which affected interstate commerce, in violation of 18 USC §1962(b).

71. Defendants conducted or participated in the conduct of the enterprise through the above-described pattern of racketeering activity which enterprise's activities affected interstate commerce in violation of 18 USC §1961(c).

72. Defendants conspired with each other to violate 18 USC §1962 (a), (b), and (c) in violation of §1962(d).

73. As a direct and proximate result of the foregoing violation of 18 USC §1962 by Defendants, the Plaintiffs have sustained injury to their family and property in an undetermined amount believed to be in excess of $500,000, plus interest.

WHEREFORE, Plaintiffs pray for judgment against Paradise Cove as hereafter stated.

## SEVENTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress)

74. Plaintiffs incorporate by this reference paragraphs 1 through 32 as if stated in full.

75. Defendant parental surrogates had a duty not to injure Stan, either physically or psychologically, but to instruct, educate, and promote his physical and psychological well-being consistent with Defendants' representations to his mother and their statutory surrogate duties. Defendants, however, negligently placed Stan in their own confined environment peopled by sadistic, controlling, untrained persons of low intelligence posing as counselors who, without cause, berated, tormented, ridiculed, belittled, scolded, deprived, and demeaned Stan so as to make him a compliant supplicant of Paradise Cove, and thereby either capture his loyalty or coerce him by fear and threats into supporting Paradise Cove's fraudulent scheme to profit from the misery it inflicted upon Stan and other minors within its control.

76. Defendants' conduct was malicious, wanton, and in reckless disregard of Stan's health, safety and welfare, by reason of which Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs pray for judgment as follows:

FIRST CAUSE OF ACTION FOR NEGLIGENCE:

a. Special damages according to proof.

b. General damages according to proof

c. Punitive damages according to proof

SECOND CAUSE OF ACTION FOR NEGLIGENT CHILD ABUSE:

Complaint                          20

a. Special damages according to proof.

b. General damages according to proof

c. Punitive damages according to proof

THIRD CAUSE OF ACTION FOR FALSE IMPRISONMENT:

a. Special damages according to proof.

b. General damages according to proof.

c. Punitive damages according to proof.

FOURTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF

EMOTIONAL DISTRESS:

a. Special damages according to proof.

b. General damages according to proof.

c. Punitive damages according to proof.

FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY:

a. Special damages according to proof.

b. General damages according to proof.

c. Punitive damages according to proof.

SIXTH CAUSE OF ACTION FOR RICO VIOLATIONS:

a. Special damages according to proof.

b. General damages according to proof trebled.

c. Punitive damages according to proof.

d. Attorneys fees according to proof.

SEVENTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF

EMOTIONAL DISTRESS

a. Special damages according to proof.

Complaint                             21

b. General damages according to proof.

c. Punitive damages according to proof.

Dated: November 17, 1998

Thomas M. Burton